# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:07-cr-124-SI |
| v. | **OPINION AND ORDER** |
| **RYAN JOHN SNIDER**, | |
| Petitioner-Defendant. | |

Billy J. Williams, United States Attorney, and Scott M. Kerin, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Ellen C. Pitcher, Attorney at Law, 0324 SW Abernethy Street, Portland, OR 97239. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

On May 27, 2015, Defendant Ryan John Snider ("Snider") moved to vacate, set aside, or correct his conviction and sentence under 28 U.S.C. § 2255 ("§ 2255"). He argues that in light of both newly discovered evidence and the standard announced in *Burrage v. United States*, 134 S. Ct. 881 (2014), his conviction and sentence for distributing drugs resulting in death are unconstitutional. On March 1, 2016, the Court held an evidentiary hearing to determine the validity of Snider's arguments. For the reasons set forth below, including Snider's failure to

PAGE 1 – OPINION AND ORDER

show that the drugs he distributed were not an independently sufficient cause of death, the Court

denies the motion.

## STANDARDS

Section 2255 permits a federal prisoner in custody under sentence to move the court that

imposed the sentence to vacate, set aside, or correct the sentence on the ground that:

> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack . . . .

§ 2255(a).

A petitioner seeking relief under § 2255 also must file his or her motion within the one-

year statute of limitations. The limitations period begins to run on the latest of four dates:

> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created
> by governmental action in violation of the Constitution or laws of
> the United States is removed, if the movant was prevented from
> making a motion by such governmental action; (3) the date on
> which the right asserted was initially recognized by the Supreme
> Court, if that right has been newly recognized by the Supreme
> Court and made retroactively applicable to cases on collateral
> review; or (4) the date on which the facts supporting the claim or
> claims presented could have been discovered through the exercise
> of due diligence.

§ 2255(f).

Under § 2255, "a district court must grant a hearing to determine the validity of a petition

brought under that section '[u]nless the motions and the files and records of the case *conclusively*

*show* that the prisoner is entitled to no relief.'" *United States v. Baylock*, 20 F.3d 1458, 1465

(9th Cir. 1994) (emphasis in original) (quoting § 2255). In determining whether a § 2255 motion

requires a hearing, "[t]he standard essentially is whether the movant has made specific factual

allegations that, if true, state a claim on which relief could be granted." *United States v. Withers*,

638 F.3d 1055, 1062 (9th Cir. 2011) (quotation marks omitted) (alteration in original). A district court may dismiss a § 2255 motion based on a facial review of the record "only if the allegations in the motion, when viewed against the record, do not give rise to a claim for relief or are 'palpably incredible or patently frivolous.'" *Id.* at 1062-63 (quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)). Conclusory statements in a § 2255 motion are insufficient to require a hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980).

If a court denies a habeas petition, the court may issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see* 28 U.S.C. § 2253(c)(2). Although the petitioner is not required to prove the merits of his case for the court to issue a certificate of appealability, the petitioner must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his or her part." *Miller-El*, 537 U.S. at 338 (quotation marks omitted).

## BACKGROUND

### A.  Snider's Guilty Pleas and Sentencing

Mr. Kraig Crow, a 19-year-old recent high school graduate, died on August 21, 2006. On the afternoon of his death, Mr. Crow purchased seven grams of powder cocaine from a friend. The friend became concerned that Mr. Crow might attempt to overdose on the cocaine and alerted Mr. Crow's girlfriend. Mr. Crow's girlfriend and parents contacted the police with concerns that Mr. Crow was suicidal, and the police found Mr. Crow's body in a park later that night. At the scene of Mr. Crow's death, police found a plastic bag containing white powder residue and an empty prescription pill bottle with the label torn off. A toxicology report showed that at the time of his death, Mr. Crow had in his blood cocaine and an opioid medication called

propoxyphene.[1] The autopsy results listed a cocaine overdose as the cause of death. A police

investigation into the source of the cocaine ultimately led to Snider's arrest.

On October 11, 2007, Snider entered a plea of guilty to the charge of distributing cocaine

in violation of 21 U.S.C. §§ 841(a) and 841(b)(l)(C). He admitted that on approximately

August 21, 2006, he sold a quantity of cocaine that, through a chain of subsequent sales, was

sold to Mr. Crow, who died as a result of using the cocaine. The crime carried a maximum

sentence of 20 years imprisonment.[2] In the plea agreement, Snider and the government agreed to

Snider's relevant conduct for sentencing purposes as follows:

> The parties agree that defendant's relevant conduct pursuant to
> U.S.S.G. §§ 1B1.3 and 2D1.1(a) is between 50 and 100 grams of
> cocaine. The parties further agree that the offense of conviction
> establishes that death resulted from the use of the controlled
> substance and thus defendant's **initial base offense level is 38**,
> prior to adjustments.[3]

The U.S. Probation Office initially recommended 168 to 210 months of imprisonment based on

the overdose death. The U.S. Probation Office further recommended an additional sentencing

enhancement of two levels based on the recovery of two firearms at Snider's residence on

April 4, 2007, for a total recommendation of 210 to 262 months' imprisonment. Snider's

---

[1] Metabolites of cocaine and propoxyphene were also found in Mr. Crow's blood.
Metabolites are the intermediate products produced as the body breaks down a substance. *See
Burrage*, 134 S.Ct. at 885.

[2] The applicable statutes, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), provide that if a
person manufactures, distributes, or possesses with the intent to distribute a controlled substance
and "if death or serious bodily injury results from the use of such substance," then the person
"shall be sentenced to a term of imprisonment of not less than twenty years or more than life."
Here, Snider was not subject to the otherwise applicable 20-year mandatory minimum sentence
because of the government's motion under United States Sentencing Guidelines ("U.S.S.G.")
§ 5K and 18 U.S.C. § 3553(e) (substantial assistance).

[3] Dkt. 28 at 13 (emphasis in original).

substantial assistance to the government, however, led the parties to agree to a jointly-recommended downward departure of 72 months of imprisonment.

Before sentencing, Snider was released from custody on pretrial supervision. While on pretrial supervision, but after the entry of his guilty plea, Snider was arrested for selling cocaine to a police informant on approximately January 10, 2008. Because of Snider's new criminal conduct, the U.S. Probation Office recommended against a reduction under the advisory guidelines for acceptance of responsibility and suggested a sentence of 240 months of imprisonment. Based on all relevant conduct, Snider's advisory sentencing guideline range was 292 to 365 months' imprisonment.

On April 11, 2008, Snider entered a guilty plea in the second case against him based on his distribution of cocaine while on pretrial supervision.[4] In his second guilty plea, Snider affirmed his first guilty plea. The parties made the following joint sentencing recommendation to the Court:

> Pursuant to U.S.S.G. § 5K1.1, 18 U.S.C. §§ 3553(a) and 3553(e), the legal issues involved in the case, and so long as defendant demonstrates an acceptance of responsibility as explained above by resolving all of his current criminal matters and provides substantial assistance in the prosecution of others as outlined above, the parties will recommend that the court sentence the defendant, on both of his cases, to a total sentence of 144 months imprisonment, to be followed by three years of supervised release.[5]

In his guilty plea, Snider waived many of his rights both to appeal and file for post-conviction relief, as follows:

> Waiver of Appeal/Post-Conviction Relief: Defendant knowingly and voluntarily waives the right to appeal from any aspect of the

---

[4] The government brought the first charge of cocaine distribution in Case No. 07-124-HA. The government brought the second charge of cocaine distribution in Case No. 08-172-HA.

[5] Dkt. 53 at 5.

conviction and sentence on any grounds unless the court imposes a
sentence which exceeds the parties [sic] recommended sentence.
Should defendant seek an appeal, despite this waiver of that right,
the USAO may take any position on any issue on appeal.
Defendant also waives the right to file any collateral attack,
including a motion under 28 U.S.C. § 2255, challenging any aspect
of the conviction or sentence on any grounds, except on grounds of
ineffective assistance of counsel, and except as provided in Fed. R.
Crim. P. 33[6] and 18 U.S.C. § 3582(c)(2).[7]

On April 21, 2008, U.S. District Judge Ancer L. Haggerty sentenced Snider to

144 months of imprisonment, followed by three years of supervised release, in both cases.

Judge Haggerty determined that the sentences in the two cases would run concurrently.

Judge Haggerty adopted most of the Presentence Report from the U.S. Probation Office, but he

did not impose an enhancement for the firearms found at Snider's residence.

---

[6] Federal Rule of Criminal Procedure 33 states:

(a) Defendant's Motion. Upon the defendant's motion, the court
may vacate any judgment and grant a new trial if the interest of
justice so requires. If the case was tried without a jury, the court
may take additional testimony and enter a new judgment.

(b) Time to File. (1) Newly Discovered Evidence. Any motion for
a new trial grounded on newly discovered evidence must be filed
within 3 years after the verdict or finding of guilty. (2) Other
Grounds. Any motion for a new trial grounded on any reason other
than newly discovered evidence must be filed within 14 days after
the verdict or finding of guilty.

[7] Dkt. 53 at 6. 18 U.S.C. § 3582(c)(2) specifies when a court may modify an imposed
term of imprisonment:

[I]n the case of a defendant who has been sentenced to a term of
imprisonment based on a sentencing range that has subsequently
been lowered by the Sentencing Commission pursuant to 28 U.S.C.
994(o), upon motion of the defendant or the Director of the Bureau
of Prisons, or on its own motion, the court may reduce the term of
imprisonment, after considering the factors set forth in section
3553(a) to the extent that they are applicable, if such a reduction is
consistent with applicable policy statements issued by the
Sentencing Commission.

In 2008, U.S.S.G. § 2D1.1(a)(2) set the base offense level at 38 for any conviction under 21 U.S.C. §§ 841(a) and 841(b)(l)(C) that establishes that death or serious bodily injury resulted from use of an unlawfully distributed substance. With a Criminal History Category of I, the offense level given to Snider in the Presentence Investigation Report, an offense level of 38 carried an advisory guideline range of 235 to 293 months of imprisonment. U.S.S.G. Ch. 5, Pt. A. Without conviction of the crime of distributing drugs resulting in death under 21 U.S.C. § 841(b)(1)(C) and the sentence enhancement under U.S.S.G. § 2D1.1(a)(2), the base offense level for distribution of between 50 and 100 grams of cocaine—the amount for which Snider was charged—was 16. U.S.S.G. § 2D1.1(c)(12).[8] For a Criminal History Category of I, the guideline range at a base offense level of 16 was 21 to 27 months of imprisonment; even a criminal history category of VI at this base offense level would only have resulted in a guideline range of 46 to 57 months of imprisonment. U.S.S.G. Ch. 5, Pt. A.

But for his conviction for distributing drugs resulting in death, Snider would not have been subject to a potential mandatory minimum of 20 years. In addition, a much lower advisory sentencing guideline range would have applied. Snider has served more than seven years of his 144-month sentence and has a scheduled release date of June 27, 2017. After Snider filed his § 2255 motion, the case was reassigned to this Court.[9]

## B.  Legal Developments after Snider's Sentencing--*Burrage*

On January 27, 2014, the Supreme Court decided *United States v. Burrage*, 134 S. Ct. 881. *Burrage* establishes that in order to convict someone of distributing a drug resulting in

---

[8] This base offense level is from the 2008 advisory sentencing guidelines. Under the 2015 advisory sentencing guidelines, the base offense level for distribution of between 50 and 100 grams of cocaine is 14. U.S.S.G. § 2D1.1(c)(13).

[9] Senior U.S. District Judge Haggerty retired from federal judicial service on December 31, 2014.

death under 21 U.S.C. § 841(b)(1)(C), the drug distributed by the defendant must constitute the "but-for cause" of death to the ultimate recipient. *Id.* at 892. According to the Supreme Court, 21 U.S.C. § 841(b)(1)(C) "imposes . . . a requirement of actual causality" that "requires proof 'that the harm would not have occurred' in the absence of—that is, but for—the defendants' conduct." *Id.* at 887-88 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525, (2013)). The Supreme Court left open the possibility that this requirement might also be satisfied "when multiple sufficient causes independently, but concurrently produce a result." *Burrage*, 134 S. Ct. at 890. The Court, however, expressly rejected the government's "less demanding" rule, adopted in several state courts, "under which an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." *Id.*

The Supreme Court offered several examples of what could constitute a but-for cause under 21 U.S.C. § 841(b)(1)(C). If A shoots B, who gets hit and dies, A is the but-for cause of B's death, even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Id.* at 888. As another example, the Supreme Court noted that "if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.* Similarly, the Court explained that if a home team wins a baseball game 1-0 and the home team's leadoff batter scores a home run, then "the victory resulted from the home run. . . . It is beside the point that the victory also resulted from a host of other necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game." *Id.* These other factors "merely played a nonessential contributing role in producing the [win]." *Id.* With these examples in mind, the

Supreme Court concluded that heroine was not the but-for cause of the decedent's death where no expert could say that the heroine would have been fatal without the cocktail of other drugs in the decedent's system.

## C. Factual Developments after Snider's Sentencing

Propoxyphene—the second drug found in Mr. Crow's blood at the time of his death—was prescribed for pain relief and sold either as a single ingredient (a medication commercially known as Darvon) or in combination with acetaminophen (a medication known commercially as Darvocet). When metabolized in the human body, propoxyphene yields norpropoxyphene. In 2010, new evidence came to light about the potentially fatal effects of propoxyphene and norpropoxyphene. On November 19, 2010, the U.S. Food and Drug Administration ("FDA") concluded that even standard doses of propoxyphene could cause fatal heart rhythm abnormalities. At the FDA's request, the drug manufacturer Xanodyne Pharmaceutical withdrew propoxyphene from the U.S. market.

Snider argues that this new medical evidence about the fatal effects of propoxyphene and norproxyphene establishes that he is "actually innocent" of distributing a drug that served as the but-for cause of Mr. Crow's death. In support of his argument, Snider submitted an expert report, dated July 7, 2015, from Richard Stripp, Ph.D., a professional toxicologist. Dr. Stripp reviewed Mr. Crow's autopsy and toxicology reports. According to Dr. Stripp, the evidence available to him suggests that Mr. Crow ingested cocaine through insufflation (the act of blowing something, such as a drug in powdered form, into a body cavity). Dr. Stripp opines that when using insufflation to ingest cocaine, adult victims who die as a result of acute cocaine over-dosage have an average postmortem blood concentration of 4.4 mg/L. Mr. Crow had a concentration of 2.0 mg/L. Dr. Stripp states that this level of cocaine concentration in Mr. Crow's blood at the

time of his death was "at the lower end of the range typically observed in acute fatalities."[10] Mr. Crow also had a propoxyphene blood concentration of 0.3 mg/L, which is below the 1.0 mg/L level "indicative of serious toxicity" and below the 2.0 mg/L level that is "consistent with death."[11] Nonetheless, Dr. Stripp states that fatalities have occurred involving no other drugs and propoxyphene concentrations of "less than 1 mg/L, as is the case here."[12] Based on his review of these facts, Dr. Stripp concludes that although the amount of cocaine was "at a level that could be consistent with a fatal outcome," he could not rule out the possibility that propoxyphene "played some role in Mr. Crow's death."[13]

William J. Brady, M.D., also reviewed Mr. Crow's autopsy and toxicology reports on behalf of Snider and authored his own report dated July 27, 2015. In his report, Dr. Brady notes that Mr. Crow's toxicology report showed "a significantly high level of cocaine."[14] Ultimately, however, Dr. Brady concludes: "With reasonable medical certainty, I believe that Mr. Crow's death resulted from ingestion of significant amounts of Darvon that amplified the action of cocaine in his body."[15]

In response to the reports submitted by Snider, the government submitted a memorandum dated December 9, 2015, from Larry V. Lewman, M.D., the Deputy Medical Examiner for the State of Oregon. Dr. Lewman also authored the original autopsy report regarding Mr. Crow's

---

[10] Dkt. 72-1 at 3.

[11] Dkt. 72-1 at 3.

[12] Dkt. 72-1 at 3.

[13] Dkt. 72-1 at 4.

[14] Dkt. 72-3 at 1.

[15] Dkt. 72-3 at 1.

death. In the memorandum of December 9, 2015, Dr. Lewman states that "it is [his] opinion that the propoxyphene ingested played no significant role in Mr. Crow's death."[16]

After reviewing the statements of Dr. Stripp, Dr. Brady, and Dr. Lewman, the Court held an evidentiary hearing on March 1, 2016. The Court's factual findings from that hearing are stated below.

## DISCUSSION

Snider argues that new evidence and the decision in *Burrage* render his sentence unlawful. According to Snider, the discovery of propoxyphene's dangerous effects and its removal from the U.S. market establish that cocaine was not the but-for cause of Mr. Crow's death, as required by *Burrage*. Therefore, argues Snider, he entered his plea of guilty to a crime that he did not commit, or for which there is no factual basis. Snider further argues that his attenuation from the actual sale of cocaine to Mr. Crow and Mr. Crow's suicidal intent show that Snider is actually innocent of causing Mr. Crow's death. The government responds that: (1) Snider waived his right to make this collateral attack in his plea agreement; and (2) even if Snider did not waive his right, *Burrage* does not affect his sentence because Snider's conduct was the but-for cause of Mr. Crow's death.[17]

If Snider's waiver of his right to appeal is enforceable, the Court need not address the merits of his § 2255 motion. *See United States v. Medina-Carrasco*, 806 F.3d 1205, 1210 (9th Cir. 2015), *amended and superseded on denial of rehearing en banc*, 2016 WL 805656 (9th Cir. Mar. 2, 2016)) (declining to reach the merits of the defendant's claim because he waived the right to appeal in his plea agreement); *United States v. Gonzalez-Melchor*, 648 F.3d

---

[16] Dkt. 79 at 2.

[17] The government stipulates that, to the extent Snider's motion relies on the Supreme Court's opinion in *Burrage*, the motion is timely under § 2255(f)(3).

959, 962 (9th Cir. 2011) (stating that although the Ninth Circuit retains jurisdiction over an appeal by a defendant who has signed an appeal waiver, the court will not exercise that jurisdiction to review the merits of the case if the defendant knowingly and voluntarily waived the right to appeal).

## A.  Whether Snider Knowingly and Voluntarily Waived His Right to File a Motion Under § 2255

Generally, waivers of the right to collaterally attack a sentence under § 2255 are valid. The Ninth Circuit recognizes the contractual nature of plea agreements and measures plea agreements by "basic principles of contract interpretation." *Medina-Carrasco*, 806 F.3d at 1210; s*ee United States v. Jeronimo*, 398 F.3d 1149, 1153 (9th Cir. 2005), *overruled on other grounds by United States v. Castillo*, 496 F.3d 947, 957 (9th Cir. 2007). While construing any ambiguity in the plea agreement in favor of the defendant, courts in the Ninth Circuit generally enforce an appeal waiver when two conditions have been satisfied: "(1) the language of the waiver encompasses the defendant's right to appeal on the grounds claimed on appeal, and (2) the waiver is knowingly and voluntarily made." *United States v. Nunez*, 223 F.3d 956, 958 (9th Cir. 2000) (quoting *United States v. Martinez*, 143 F.3d 1266, 1270-71 (9th Cir. 1998)); *see United States v. Watson*, 582 F.3d 974, 986 (9th Cir. 2009) ("Plea agreements are interpreted using contract principles with any ambiguity construed in the defendant's favor."). Courts also enforce waivers of the right to bring a § 2255 motion as long as the defendant expressly waives the right. *See United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994) ("A plea agreement does not waive the right to bring a § 2255 motion unless it does so expressly. The government gets what it bargains for but nothing more.").

In *United States v. Navarro-Botello*, 912 F.2d 318 (9th Cir. 1990), the Ninth Circuit addressed whether an appeal waiver renders a plea agreement unknowing or involuntary. The

defendant had entered into a plea agreement waiving his right to appeal. He later appealed on the basis that the plea agreement was invalid because he could not possibly know or understand what appellate issues might arise after sentencing. The Ninth Circuit rejected this argument. In reaching its conclusion that defendants may validly waive their right to appeal in plea agreements, the Ninth Circuit emphasized, "Whatever appellate issues might have been available to [the defendant] were speculative compared to the certainty derived from the negotiated plea with a set sentence parameter. He knew he was giving up possible appeals, even if he did not know exactly what the nature of those appeals might be." *Id.* at 320. The Ninth Circuit also recently reiterated that it "will enforce a valid waiver even if the claims that could have been made on appeal absent that waiver appear meritorious, because '[t]he whole point of a waiver . . . is the relinquishment of claims *regardless* of their merit.'" *Medina-Carrasco*, 806 F.3d at 1210-11 (quoting *United States v. Nguyen*, 235 F.3d 1179, 1184 (9th Cir. 2000), *abrogated on other grounds by United States v. Rahman*, 642 F.3d 1257, 1259 (9th Cir. 2011)) (emphasis and alteration in original).

In this case, Snider stipulated that he committed the crime of distributing a drug that resulted in death under 21 U.S.C. § 841(b)(1)(C) and that he thus became potentially subject to the mandatory minimum sentence under the statute and the "death-results" sentence-enhancement of U.S.S.G. § 2D1.1(a). Snider's plea agreement also expressly states that he "waives the right to file any collateral attack, including a motion under 28 U.S.C. § 2255 . . . , except on grounds of ineffective assistance of counsel, and except as provided in Fed. R. Crim. P. 33 and 18 U.S.C. § 3582(c)(2)."[18] Snider signed a statement that he "freely and voluntarily accept[s] the terms and conditions of this plea offer, after first reviewing and discussing every

---

[18] Dkt. 53 at 6.

part of it with [his] attorney."[19] The minutes from the sentencing hearing show that the Court advised Snider that his plea agreement contains a waiver of the right to appeal. Snider's waiver thus encompasses the right to file a § 2255 motion except under circumstances not applicable in this case,[20] and he made the waiver knowingly and voluntarily. Ordinarily, Snider's waiver of his right to collaterally attack his sentence would bar this appeal without further question.

## B.  Whether Snider's Waiver of the Right to File a § 2255 Motion Applies to Rights Not in Existence at the Time of the Plea Agreement

Despite his valid waiver of his right to bring a collateral attack on his sentence, Snider argues that the waiver should not apply in this case because *Burrage* altered his substantive rights. In general, changes in substantive law do not invalidate plea agreements. The Ninth Circuit has held that "a change in the law does not make a plea involuntary and unknowing." *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005) (citation omitted); *see also United States v. Cortez-Arias*, 425 F.3d 547, 548 (9th Cir. 2005) (stating that "a favorable change in the law does not entitle a defendant to renege on a knowing and voluntary guilty plea"). These cases rest, in large part, on the Supreme Court's decision in *Brady v. United States*, 397 U.S. 742 (1970). There, the Supreme Court held that "a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Id.* at 757.

---

[19] Dkt. 53 at 8.

[20] The plea agreement specifies that Snider waives his right to file a § 2255 motion except under three circumstances, none of which apply in this case. Snider does not argue that he received ineffective assistance of counsel; he did not move for a new trial or judgment under Federal Rule of Criminal Procedure 33 based on newly-discovered evidence within three-years of the entry of his guilty plea; and he does not move to reduce his sentence under 18 U.S.C. § 3582(c)(2) based on changes in the sentencing guidelines made by the Sentencing Commission.

In some cases, however, a defendant may use a new rule announced by the Supreme Court to attack the constitutionality of a guilty plea in a habeas proceeding. *See United States v. Benboe*, 157 F.3d 1181 (9th Cir. 1998) (holding that despite his guilty plea, the defendant could challenge his sentence for "using or carrying" a firearm in the commission of a drug crime after the Supreme Court clarified that "using or carrying" a firearm does not include storing a firearm in the same room with drugs). To affect the constitutionality of a final plea agreement, a new rule must apply retroactively. *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). A rule is new where "it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 301 (1989) (plurality opinion).

New procedural rules generally do not apply retroactively; new substantive rules generally do. *Schriro*, 542 U.S. at 351-52. Substantive rules include "decisions that narrow the scope of a criminal statute by interpreting its terms." *Id.* at 351. "[C]onstitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish" qualify as substantive rules as well. *Id.* at 352. Still, a valid waiver of the right to bring a § 2255 motion may bar a defendant from arguing that even a retroactive substantive change in the applicable law invalidates his or her plea agreement. *See Benboe*, 157 F.3d at 1183 (emphasizing that "[the defendant] did not expressly waive his right to file for collateral relief").

In *United States v. Johnson*, the Ninth Circuit directly addressed the question whether a supervening change in the law invalidates appeal waivers, or what the Ninth Circuit called the "temporal scope" of appeal waivers. 67 F.3d 200, 202 (9th Cir. 1995). The defendant entered a guilty plea to possession of heroin with the intent to distribute, and in his plea agreement, he

waived his right to appeal. Between the time of his plea and the time of his sentencing, Congress

passed the Violent Crime Control and Law Enforcement Act of 1994 ("Crime Bill"). The Crime

Bill allowed a court to sentence certain drug offenders without regard to statutory minimum

sentences. The sentencing court concluded that the Crime Bill's sentencing provisions did not

apply to the defendant and sentenced him to the mandatory minimum of ten years. The defendant

appealed his sentence, and the Ninth Circuit upheld that sentence based on the defendant's

appeal waiver. According to the Ninth Circuit, "[the defendant's] appeal waiver encompasses

appeals arising out of the law applicable to his sentencing. . . . Although the sentencing law

changed in an unexpected way, the possibility of a change was not unforeseeable at the time of

the agreement." *Id.* at 202.

Other circuits that have addressed this question similarly have held that broad waivers of

the right to appeal or collaterally attack a sentence "are effective even if the law changes in favor

of the defendant after sentencing." *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005)

(citing *United States v. Bradley*, 400 F.3d 459, 463-66 (6th Cir. 2005)); *see United States v.

Killgo*, 397 F.3d 628, 629 n.2 (8th Cir. 2005); *Garcia-Santos v. United States*, 273 F.3d 506, 509

(2d Cir. 2001) (per curiam); *United States v. Teeter*, 257 F.3d 14, 21-23 (1st Cir. 2001); *Johnson*,

67 F.3d at 202-03; *United States v. Rutan*, 956 F.2d 827, 829-30 (8th Cir. 1992), *overruled in

part on other grounds by United States v. Andis*, 333 F.3d 886, 892 n.6 (8th Cir. 2003) (en

banc)). Explaining its rationale, the *Bownes* court emphasized, "[h]ad [the defendant] insisted on

an escape hatch that would have enabled him to appeal if the law changed in his favor after he

was sentenced, the government would have been charier in its concessions." 405 F.3d at 636.

The *Bownes* court further explained that defendants may actually suffer from a contrary rule that

allows defendants to rescind appeal waivers where a "sea change" in the law occurrs after

sentencing:

> Apart from the fact that the government would insist on a
> compensating concession, and apart from the further fact that
> rescission would relieve the government from whatever
> concessions it had made to obtain the agreement, the government
> would be able to rescind a plea agreement favorable to the
> defendant if an intervening decision had brought about a 'sea
> change' in favor of the government; what is sauce for the goose is
> sauce for the gander.

*Id.* at 637-38 (citations omitted).

In the Ninth Circuit, an appeal waiver made knowingly and voluntarily and otherwise in

compliance with Federal Rule of Criminal Procedure 11 will bar collateral attacks on a sentence

in all but three circumstances: (1) the sentencing judge informs a defendant that he or she retains

the right to appeal; (2) the defendant's "sentence does not comport with the terms of the plea

agreement"; or (3) "the sentence violates the law." *United States v. Bibler*, 495 F.3d 621, 624

(9th Cir. 2007); *see also United States v. Gordon*, 393 F.3d 1044, 1050 (9th Cir. 2004) (holding

that a valid appeal waiver did not apply where the defendant received a sentence "in excess of

the maximum penalty provided by statute").  According to the Ninth Circuit: "A sentence is

illegal if it exceeds the permissible statutory penalty for the crime or violates the Constitution."

*Bibler*, 495 F.3d at 624.[21]

---

[21] Some circuits will enforce a valid appeal waiver unless doing so would constitute a
"miscarriage of justice." *See United States v. Guillen*, 561 F.3d 527, 531 (D.C. Cir. 2009);
*United States v. Johnson*, 410 F.3d 137, 151 (4th Cir. 2005); *United States v. Hahn*,
359 F.3d 1315, 1327 (10th Cir. 2004); *United States v. Andis*, 333 F.3d 886, 891 (8th Cir. 2003)
(en banc); *United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001); *United States v. Teeter*,
257 F.3d 14, 25 (1st Cir. 2001). The Second Circuit analyzes appeal waivers under "general
fairness principles." *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) (quoting *United
States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1991)). The Seventh Circuit scrutinizes appeal waivers
for violations of due process. *United States v. Bownes*, 405 F.3d 634, 637-38 (7th Cir. 2005). The
Sixth Circuit has declined to adopt a specific framework but has held that an appeal waiver does

Thus, a mere change in the law, even if the change is a retroactive new rule, is insufficient to render Snider's waiver of his right to file a § 2255 motion unenforceable. He waived his right to file a § 2255 collateral attack "challenging any aspect of the conviction or sentence."[22] Under the Ninth Circuit's decision in *Johnson*, this appeal falls within the "temporal scope" of the waiver. 67 F.3d at 202. In accordance with the standards applied by the Ninth Circuit, the waiver is enforceable unless Snider's sentence is "illegal," meaning that his sentence exceeds the permissible statutory penalty for the crime or violates the Constitution. Snider does not dispute that his sentence falls within the still-applicable guideline range if he distributed a substance that served as the but-for cause of Mr. Crow's death. Nor does Snider argue that the guideline range for such a crime violates the Constitution. Snider's sentence would only possibly qualify as "illegal" if his sentence exceeds the permissible statutory penalty because he did not actually commit the crime of distributing a drug that resulted in death in violation of 21 U.S.C. § 841(b)(1)(C).

## C. Whether Snider's Sentence Was "Illegal"

### 1. Legal Framework

As an initial matter, the Supreme Court and the Ninth Circuit have not yet decided whether the *Burrage* decision—that a substance must act as the but-for cause of death for a defendant to be found guilty of causing that death—announces a new substantive rule that applies retroactively. Other courts disagree on whether *Burrage* applies retroactively. *Compare United States v. Grady*, 2015 WL 4773236, at *4 (W.D. Va. Aug. 12, 2015) ("[T]he court notes that *Burrage* is a statutory interpretation case that likely does not apply retroactively to cases on

---

not preclude claims that a sentence exceeds the statutory maximum. *United States v. Caruthers*, 458 F.3d 459, 472 (6th Cir. 2006).

[22] Dkt. 53 at 6.

collateral review, because the Supreme Court has not declared it to be retroactively applicable, and no other court has such authority."), *with United States v. Schneider*, 112 F. Supp. 3d 1197, 1207 (D. Kan. 2015) ("The government concedes, and the court agrees, that *Burrage* announces a new substantive rule of law applicable to cases on initial collateral review.").

Snider argues that the Eighth Circuit has found *Burrage* to be retroactive and that this Court should follow suit. In *Ragland v. United States*, the Eighth Circuit vacated the district court's denial of § 2255 relief and remanded the case to the district court to reconsider the defendant's conviction in light of *Burrage*. 756 F.3d 597, 602 (8th Cir. 2014). On remand, the government conceded that it could not prove but-for causation and that *Burrage* applied retroactively. The government nonetheless argued that the district court lacked authority to grant § 2255 relief because the enhanced sentence did not exceed the maximum statutory sentence that applied without the enhancement. The district court agreed, but the Eighth Circuit reversed, vacating the defendant's conviction for distribution of heroin resulting in death and remanding for resentencing on the lesser included offense of distribution of heroin. *Ragland v. United States*, 784 F.3d 1213, 1214 (8th Cir. 2015). Contrary to Snider's assertion, the Eighth Circuit did not explicitly hold that *Burrage* applies retroactively.

The Court notes that the Ninth Circuit appears to have always interpreted 21 U.S.C. § 841(b)(1)(C) as requiring but-for causation. In *United States v. Houston*, decided three years before Snider's sentencing, the Ninth Circuit stated: "Cause-in-fact is required by the 'results' language [of 21 U.S.C. § 841(b)(1)(C)] . . . ." 406 F.3d 1121, 1125 (9th Cir. 2005). The Ninth Circuit has interpreted "cause-in-fact" as a but-for standard. *See, e.g.*, *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir. 1986) ("Cause in fact is relatively simple in this case. But for the conspiracy, [the victim] would not have died in the manner he did.").

This Court need not, however, resolve the question of whether *Burrage* announces a new retroactive rule. The government concedes that Snider's § 2255 motion is timely under 28 U.S.C. § 2255(f)(3) to the extent that the motion relies on the argument that *Burrage* announces a new substantive rule that applies retroactively. The government does not contend that the *Burrage* standard is inapplicable in this case. Thus, the Court considers whether the evidence was sufficient to convict him of distributing a drug that "caused" Mr. Crow's death under the rule announced in *Burrage* in combination with the new evidence concerning the effects of propoxyphene.

In *Burrage*, two medical experts testified regarding the multiple drugs in the decedent's system at the time of death. The metabolites of heroin, the drug sold by the defendant, were present along with codeine, alprazolam, clonazepam metabolites, and oxycodone. *Burrage*, 134 S. Ct. at 885. One expert testified that "[a]lthough morphine, a heroin metabolite, was the only drug present at a level above the therapeutic range . . . , [the expert] could not say whether [the decedent] would have lived had he not taken the heroin." *Id.* The second expert testified that "mixed drug intoxication" caused the decedent's death and that heroin, oxycodone, alprazolam, and clonazepam all played "contributing" roles in the victim's death. *Id.* at 886. The second expert also testified that although she "could not say whether [the decedent] would have lived had he not taken the heroin," she could say that "[his] death would have been 'very less likely.'" *Id.* Additionally, "[n]o expert was prepared to say that [the decedent] would have died from the heroin use alone." *Id.* at 890.

The *Burrage* court expressly refrained from deciding whether a "special rule" applies "when multiple sufficient causes independently, but concurrently, produce a result." *Id.* The Supreme Court held "that, ***at least where use of the drug distributed by the defendant is not an***

*independently sufficient cause of the victim's death* . . . , a defendant cannot be liable under the

penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of

the death . . . ." *Id.* at 892 (emphasis added). The *Burrage* decision strongly implies, however,

that the but-for standard ordinarily applicable under 21 U.S.C. § 841(b)(1)(C) either does not

apply to or may encompass a situation when use of a drug distributed by a defendant is

independently sufficient to cause death despite the presence of other concurrent sufficient causes.

In this unique circumstance, the *Burrage* decision suggests that 21 U.S.C. § 841(b)(1)(C) still

imposes criminal liability; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989),

*superseded on other grounds by statute as stated by Burrage*, 134 S. Ct. at 889 n.4  (noting that

when two forces act upon an object, either of which would have moved the object if acting alone,

it cannot be the case that the a finder-of-fact must apply the but-for test and conclude that the

event had no actual cause).[23]

## 2.  Factual Findings

In this case, Snider offers the written opinions of two experts explaining that

propoxyphene played a role in Mr. Crow's death. In light of recent evidence regarding

propoxyphene, neither of defendant's two experts was prepared to say that Mr. Crow would have

lived had he taken the dose of propoxyphene alone, without cocaine. In their written reports, the

---

[23] Federal courts have infrequently addressed the problem of concurrent sufficient causes. State courts, however, have more often had occasion to address the issue. Most courts hold that an act that is sufficient to bring about a harm is a cause-in-fact even if the harm would still have occurred in the absence of the act. *See, e.g.*, *People v. Lewis*, 124 Cal. 551, 559 (1899) ("[A]lthough a man cannot be killed twice, two persons, acting independently, may contribute to his death, and each be guilty of a homicide. . . . . [I]f he is dying from a wound given by another, both may properly be said to have contributed to his death."); *State v. Tribble*, 790 N.W.2d 121, 127 n.2 (Iowa 2010) (noting that Iowa has adopted "a legal rule that simply declares multiple causes that alone would have been a factual cause under the 'but for' test to be factual causes"); *State v. Munoz*, 126 N.M. 535, 545-46 (1998) (stating that New Mexico's murder statute contains "not the slightest suggestion that if there are multiple individuals responsible for the death that any of them is less guilty of the crime of murder").

experts similarly appeared to be unable to conclude that Mr. Crow would have died had he taken the dose of cocaine alone, without propoxyphene. On the other hand, the government offers the written opinion of the Deputy Medical Examiner, Dr. Lewman, who opined in his written report that the propoxyphene ingested played no significant role in Mr. Crow's death.

During the evidentiary hearing, both Dr. Lewman (for the government) and Dr. Brady (for the defense) testified. The Court asked the parties' expert witnesses the following two questions:[24]

> (1)    Is it your opinion beyond a reasonable doubt that Mr. Crow would have *lived* if he had *not* taken cocaine?"[25]

> (2)    Is it your opinion beyond a reasonable doubt that Mr. Crow still would have *died* after taking *cocaine* if he did *not* also take the other medications that produced the levels of propoxyphene or norpropoxyphene that were found in his system? In other words, is it your opinion beyond a reasonable doubt that Mr. Crow still would have *died* as a result of taking or ingesting only cocaine?[26]

The Court gave both expert's the option of answering "yes," "no," or "other," and then the Court gave counsel for both parties the opportunity to question the experts about their answers.

Dr. Lewman answered "yes" to the first question and "yes" to the second question. Dr. Brady answered "other" to the first question and "yes" to the second question.

---

[24] The Court did not ask the experts whether they held their opinions to "a reasonable degree of medical certainty" because this question is usually used in civil cases to refer to a preponderance standard. In criminal cases, asking experts to express their opinions to "a reasonable degree of medical certainty" can therefore create confusion about the burden of proof. *See* Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certaintytate,"* 57 Md. L. Rev. 380 (1998), available at http://digitalcommons.law.umaryland.edu /mlr/vol57/iss2/4 (last visited on April 7, 2016).

[25] This is the question that the holding in *Burrage* appears to require.

[26] This question relates to the theory of an independently sufficient concurrent cause that *Burrage* appears to leave open as a possible alternative form of "but for" causation.

Dr. Lewman testified first. He stated that he answered "yes" to the first question because he believed propoxyphene played no role in Mr. Crow's death and was present in Mr. Crow's system at a therapeutic level. Dr. Lewman emphasized the ratio of the metabolite norpropoxyphene to the actual drug propoxyphene, which was three to one. According to Dr. Lewman, the higher level of norpropoxyphene was consistent with Mr. Crow taking propoxyphene at only therapeutic levels over time because norpropoxyphene gradually accumulates in the body. Dr. Lewman acknowledged, however, that there was no evidence to suggest that Mr. Crow had a prescription for propoxyphene.

Dr. Lewman testified that he answered "yes" to the second question based on the extremely high level of cocaine in Mr. Crow's system. Further, according to Dr. Lewman, the history surrounding Mr. Crow's death informs his opinion. The evidence shows that Mr. Crow called friends to say that he had taken too much cocaine and then was found dead within two hours of those calls. Dr. Lewman found the timing of the calls and Mr. Crow's sudden death to be consistent with a cocaine overdose. The swift post-mortis stiffening of Mr. Crow's body also strongly suggests that he died suddenly after ingesting a stimulant drug. Because cocaine is a stimulant, whereas propoxyphene is a depressant, Dr. Lewman believed that the state of Mr. Crow's body was more consistent with a cocaine overdose than a combined cocaine-propoxyphene or propoxyphene overdose.

Dr. Brady, testifying for the defense, next had an opportunity to explain his answers to the Court's questions. Regarding the first question, Dr. Brady stated that the level of propoxyphene that Mr. Crow ingested was within levels reported as fatal and that he could not rule out that propoxyphene could either have independently killed Mr. Crow or contributed to his death. Dr. Brady stated that he disagreed with Dr. Lewman's conclusion that propoxyphene

played no role in Mr. Crow's death because the drug can have a strong effect on the body and can have deadly cardiac effects even when taken in therapeutic doses. Accordingly, Dr. Brady emphasized that he could not rule out that propoxyphene contributed to the manner of Mr. Crow's death.

With regard to the second question, Dr. Brady explained that he agreed with Dr. Lewman. Dr. Brady believed that Mr. Crow had a fatal level of cocaine in his system that would have been independently sufficient to kill him. When questioned further, Dr. Brady acknowledged that he could not say with certainty that Mr. Crow would have died of a cocaine overdose if he had received medical treatment promptly after ingesting the cocaine alone. Dr. Brady stated, however, that it would be very unusual for someone such as Mr. Crow—who had no known history of regular cocaine use that would have led him to build up a tolerance to the drug—to survive the cocaine concentration found in his blood. Given that Mr. Crow was found dead before anyone could administer medical treatment, Dr. Brady testified that he had no doubt that Mr. Crow ingested a fatal dose of cocaine.

Based on the expert testimony admitted at the hearing, the Court finds that there is insufficient evidence to prove beyond a reasonable doubt that Mr. Crow would have lived had he not taken cocaine. Propoxyphene has been known to cause death at the level found in Mr. Crow's blood. Notwithstanding the ratio of norpropoxyphene to propoxyphene, there is no evidence that Mr. Crow had a prescription for propoxyphene and regularly took it in doses recommended by a treating physician. Without evidence that Mr. Crow could tolerate therapeutic levels of propoxyphene, the Court cannot rule out that Mr. Crow could have died if he had only taken propoxyphene on the night of his death.

The Court also finds, however, that the evidence proves beyond a reasonable doubt that Mr. Crow would have died from the amount of cocaine in his system even without the propoxyphene. Both experts testified that Mr. Crow ingested a fatal dose of cocaine. Although Mr. Crow could potentially have survived if he had received medical attention in time, the evidence shows that he died before anyone could reach him. The precise time and manner of Mr. Crow's death may have resulted from the combined effects of propoxyphene and cocaine, but the cocaine alone would have sufficed to kill him.

### 3. Legal Conclusions

Unlike in *Burrage*, the experts in this case agree that the drug distributed by Snider was an independently sufficient cause of Mr. Crow's death. *Burrage* left open the possibility that a defendant may be guilty under 21 U.S.C. § 841(b)(1)(C) when use of a drug distributed by the defendant is one of several sufficient causes of death. The Court is not aware of any Ninth Circuit case to the contrary. Because Snider distributed cocaine that was independently sufficient to kill Mr. Crow, Snider violated 21 U.S.C. § 841(b)(1)(C). Accordingly, his sentence for that crime is not illegal, rendering his waiver of the right to file a § 2255 motion enforceable.

## D.  Whether Snider is Actually Innocent

Snider also argues that he is actually innocent of distributing drugs that "caused" Mr. Crow's death under the standard articulated in *Burrage* and in light of the new evidence concerning propoxyphene.[27] This is essentially the same argument that Snider raises in his

---

[27] Snider also argues that he is actually innocent because his conduct was too attenuated from Mr. Crow's death—particularly in light of reports that Mr. Crow intended to commit suicide—to serve as a but-for cause. This argument is unavailing because 21 U.S.C. § 841(b)(1)(C) does not require foreseeability or proximate cause. *United States v. Houston*, 406 F.3d 1121, 1124 (9th Cir. 2005) ("The plain language of § 841(b)(1)(C) demonstrates that proximate cause is not a required element. Congress specified that the heightened sentence would apply 'if death . . . results' from the distribution of a controlled substance. This passive

attempt to show that his appeal waiver is unenforceable. The Court has already concluded that Snider's sentence was not illegal and therefore that his appeal waiver is enforceable. Even if Snider had not waived his right to appeal or the waiver were unenforceable, however, Snider has not shown actual innocence for many of the same reasons that he cannot show that his sentence was illegal.

The Supreme Court has, on several occasions, assumed without expressly deciding that a "freestanding" claim of actual innocence is a cognizable claim on federal habeas review. *See House v. Bell*, 547 U.S. 518, 554-55 (2006); *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *see also McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) ( "We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). Although the Supreme Court has not clearly stated a standard for a freestanding actual innocence claim, the Supreme Court has differentiated between "actual innocence" for the purposes of the gateway showing necessary to overcome a procedural bar and "a hypothetical freestanding innocence claim." *House*, 547 U.S. at 555. The freestanding claim would require "more convincing proof of innocence" than the "gateway standard" articulated in *Schlup v. Delo*, 513 U.S. 298 (1995). *House*, 547 U.S. at 555. In *Schulp*, the Supreme Court explained:

> [Actual innocence] does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

language unambiguously eliminates any statutory requirement that the death have been foreseeable." (citation omitted)).

*Schlup*, 513 U.S. at 329. In his dissent in *Herrera*, Justice Blackmun suggested a precise standard

for a freestanding claim: "[T]he petitioner must show that he probably is innocent. . . . When a

defendant seeks to challenge the determination of guilt after he has been validly convicted and

sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt

about his guilt." 506 U.S. at 442 (Blackmun, J., dissenting).

　　　The Ninth Circuit allows defendants to bring freestanding innocence claims to

collaterally attack their convictions and sentences. *See United States v. Berry*, 624 F.3d 1031,

1038 n.5 (9th Cir. 2010) ("This circuit recognizes a claim of actual innocence that is cognizable

under § 2255."). The standard of proof, however, for entitlement to relief based on actual

innocence is "extraordinarily high." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en

banc) (quoting *Herrera*, 506 U.S. at 417). To prevail, a petitioner "must go beyond

demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."

*Id.* at 476. This is "a stronger showing than insufficiency of the evidence to convict." *Id.* To

assess actual innocence, a court must undertake a "holistic assessment of the evidence." *Jones v.

Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014).

　　　For the reasons already discussed, the Court concludes that Snider has failed to present

affirmative proof that he is probably innocent of distributing drugs that resulted in death. In the

evidentiary hearing, Snider's own expert witness, Dr. Brady, stated that he believed Mr. Crow

ingested a fatal amount of cocaine regardless of whether propoxyphene also contributed to

Mr. Crow's death. *Burrage*, at least implicitly, appears to allow an independently sufficient

cause of death to satisfy the requirements of 21 U.S.C. § 841(b)(1)(C). Thus, because Snider has

not shown that he is actually innocent of the crime of distributing a drug that resulted in death,

PAGE 27 – OPINION AND ORDER

Snider's sentence does not exceed the maximum authorized by law. Snider is not entitled to habeas relief.

## CONCLUSION

The Court DENIES Snider's Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255. Dkt. 59. The Court, however, issues a Certificate of Appealability on the basis that the Court's decision is based on an interpretation of *Burrage* that has not yet been expressly endorsed or rejected by either the Supreme Court or the Ninth Circuit.

**IT IS SO ORDERED**.

DATED this 13th day of April, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge